IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 27, 2004 Session

## STATE OF TENNESSEE v. BOBBY JOE GENTRY

**Direct Appeal from the Criminal Court for Knox County**
**No. 72766     Richard Baumgartner, Judge**

_____

**No. E2003-01069-CCA-R3-CD**
**May 6, 2004**
_____

A Knox County jury convicted the Defendant, Bobby Joe Gentry, of aggravated rape, and the trial court sentenced the Defendant as a repeat violent offender to life in prison without the possibility of parole. The Defendant appeals, contending that: (1) the evidence is insufficient to support his conviction; (2) the trial court erred when it failed to dismiss the indictment; (3) the trial court erred when it charged the jury on the elements of aggravated rape and aggravated sexual battery and on the culpable mental state; (4) he was denied effective assistance of counsel; (5) Tennessee Code Annotated section 40-35-120 (1997), under which the Defendant was sentenced as a violent offender, is unconstitutional; and (6) the trial court erred when it found that the Defendant qualified as a violent offender pursuant to Tennessee Code Annotated section 40-35-120. Finding no reversible error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Russ Greene (at trial) and Mike G. Nassios (at hearing on the motion for new trial and on appeal), Knoxville, Tennessee, for the appellant, Bobby Joe Gentry.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Randall E. Nichols, District Attorney General; James N. Ramsey, District Attorney General Pro Tem; and Jan Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

**Opinion**
**I. Facts**

This case arises out of an aggravated rape of the victim. In March of 2001, the Knox County Grand Jury indicted the Defendant for one count of aggravated rape and two counts of rape, and the indictment was signed by the Knox County District Attorney General, Randall E. Nichols. On August 9, 2001, the trial court was petitioned to recuse General Nichols and appoint a District

Attorney General Pro Tem because General Nichols had previously represented the Defendant while the general was in private practice. The trial court granted this petition and appointed Anderson County District Attorney General James Ramsey as District Attorney General Pro Tem to prosecute this case.

## A. Evidence Presented at Trial

The following evidence was presented at the Defendant's trial. The victim testified that she was born in 1985 and that in March of 2001 she was living in Claxton, Tennessee, with her father, stepmother, and sister. The victim, who was fifteen years old at the time, stated that she met the Defendant in January or February of 2001 through her cousin, Christine Medlin, whom the Defendant was dating at the time. The victim stated that, prior to March of 2001, she had seen the Defendant every weekend or every other weekend at Medlin's apartment, located in Knoxville, and she and the Defendant "got along great." The victim testified that, on Saturday, March 10, 2001, she called Medlin and asked if she could go to Medlin's apartment and spend the night. The victim stated that Medlin told her that she was going out with a friend, but she would have the Defendant come get the victim and take her to the apartment. The victim testified that the Defendant picked her up between 3:30 p.m. and 4:30 p.m., and the two went to the liquor store where the Defendant bought vodka and then to the grocery store where the Defendant bought orange juice. The victim stated that they then went to Medlin's apartment, where the victim talked on the phone to friends and listened to music until Medlin came home with her friend, Stacy Parton, at around 8:30 p.m.

The victim testified that, after Medlin came home, she sat on the floor while Medlin, Parton and the Defendant were on the couch. She said that she drew pictures and that they were "just joking around, watching TV, and listening to music" for approximately two hours. The victim stated that she got tired and that Medlin, Parton and the Defendant went into the bedroom. She said that she laid down on the couch in the living room to go to sleep at around 11:30 p.m. wearing a "black sports bra with a black shirt over it, panties, and some beige shorts" and covered by a blanket. The victim testified that, when she went to sleep, she was in the living room by herself and that she had the television on. The victim stated that the next thing that she remembers was that she "felt something, and I woke up, and [the Defendant] was [o]n the floor beside the couch." The victim testified that, at this time, the Defendant "had his finger up me" and did not say anything. She stated that it felt like a scrape or a pinch and that she turned over away from the Defendant and started yelling for Medlin. The victim stated that the Defendant said, "What are you doing? What are you tripping on? Sit down. Leave them alone." The victim said that she went to Medlin's bedroom and Medlin asked her what was wrong because she was crying, and the victim told her what the Defendant had done. The victim testified that Medlin and Parton, who was in the bedroom with Medlin at the time, both got up and took the victim back to her house.

The victim testified that Parton and Medlin took her home at about 3:45 a.m. and that, on the way home, she called her parents from Medlin's cell phone and told them she was coming home and needed to talk to them. She said that, when she arrived at home, she told her parents what had happened. The victim said that she and her father then left in her father's car, followed by Parton

and Medlin in Parton's car, and went to Medlin's apartment, where they called the police and waited outside until police arrived.

The victim stated that, on March 12, 2001, she went to the crisis center and was examined by Penny McDonald. The victim testified that the examination was "very painful." The victim stated that "[McDonald] had to check me down there because of what he did, and about a . . . few centimeters in, she pushed on this one part, and it hurt so bad." The victim stated that she had never been sore in her vagina before being attacked by the Defendant.

On cross-examination, the victim stated that she was fifteen at the time of the rape. The victim stated that, before this incident, the Defendant had never made any overtures or "off-color" comments to her. She stated that, when she woke up, the Defendant was sitting next to the couch with his hand up through the leg of her shorts and inside her vagina. The victim stated that, before the incident, she made a phone call to a friend named Jonathan, who was also fifteen. The victim stated that she met Jonathan two weeks before the incident and that he had since moved from the area. The victim also said that she may have talked on the phone with a man named Casey, who was eighteen or nineteen and whom she knew through friends. The victim stated that, in the three days before the incident, she did not have any kind of sexual penetration at all.

Christine Jessica Medlin, the victim's cousin, testified that she lived in Knoxville with the Defendant in March of 2001. Medlin testified that the apartment in which the couple lived had one bedroom, and neither she nor the Defendant were employed at the time of the incident. Medlin stated that she and the victim were cousins and that they had a good relationship. She said that, on March 10, 2001, she went to a wedding with her friend Parton, whom she had known for approximately one month. Medlin testified that, before going to the wedding, the victim called and said that she wanted to come over, so Medlin made arrangements for the Defendant to pick up the victim from the victim's house and bring her to Medlin's apartment. Medlin said that she and Parton returned from the wedding between 8:00 p.m. and 9:00 p.m. that evening and that, at the wedding, she did not consume any alcohol. Medlin stated that, when she returned from the wedding, the Defendant was drinking vodka and orange juice. She said that she, Parton and the Defendant went to bed at around 12:30 a.m. that evening and that, when they went to bed, the victim was in the living room.

Medlin testified that the next thing that she remembered was the victim calling her name and crying. Medlin said that, when she heard the victim, she told her to come in the bedroom, and the victim told her that "she woke up to [the Defendant] touching her." She said that, prior to this, she last saw the Defendant asleep in the bed with her and Parton. Medlin stated that the three were strictly sleeping and that there was "nothing sexual" going on between them. Medlin stated that, when the victim came into her room, the victim was crying and "shaken up" and could "hardly talk." Medlin stated that, after the victim told her what had happened, she got dressed and she and Parton took the victim home. Medlin said that, as they were leaving, she saw the Defendant lying on the couch, and he did not say anything to them as they left.

Medlin stated that, as they were driving the victim home, the victim called her father, and the victim's father and stepmother were awake and waiting for them when they arrived. Medlin said that she told the victim's father what had happened, and then all of them drove straight to Medlin's apartment in Knoxville. Medlin testified that the victim's father called the police from outside her apartment, and she and Parton went into the apartment to wait for the police and found the Defendant asleep on the couch. Medlin said that she and Parton waited in the bedroom for the police to arrive, while the victim and her father waited outside.

On cross-examination, Medlin testified that she met Parton from a telephone dating service, and Parton was listed in the lesbian section of the service. Medlin stated that neither she nor Parton drank on the day of the rape. She also said that she was "seeing" Parton at the time of the incident, and the Defendant had a problem with her relationship with Parton. Medlin stated that she knew Jonathan through the victim, but that he had never stayed at her apartment. She also said that she knew a man named Casey through the victim and the victim's father. Medlin explained that Casey was a "friend of the family's" and came over to the apartment "from time to time" to visit, but he had never stayed at the apartment. Meldin testified that she dated Parton for almost a year, but that they broke up in September. Medlin said that, when she was dating the Defendant, they would argue because he drank too much and he had a bad temper.

Jennifer Uthe, the victim's stepmother, testified that, before March 11, 2001, she did not know the Defendant personally, but knew of him as her niece's boyfriend. Jennifer Uthe testified that, during the early morning hours of March 11, 2001, the victim called her crying and sounded "hysterical." She said that she could not understand the victim clearly and then the victim gave the phone to Medlin. Jennifer Uthe stated that, shortly thereafter, the victim came home and was "[h]ysterical, crying, [and] upset." She said that the victim told them that the Defendant had touched her. Jennifer Uthe testified that her husband, the victim, Medlin and Parton then left the house while she stayed home. On cross-examination, Jennifer Uthe testified that she had met Jonathan, who was the victim's friend. She also stated that she knew Casey.

Michael Uthe, the victim's father, testified that on, March 11, 2001, his wife woke him up at around 5:00 a.m. He stated that, when the victim arrived at the house, she appeared "[v]ery upset, crying, [and] shaky," and she told him that "she had been violated" by the Defendant. Michael Uthe stated that he then took the victim back to Medlin's apartment and called the police from his car, which was parked outside the apartment. He stated that he took the victim to the rape crisis center on Monday, March 12, 2001, because it was closed on Sunday. On cross-examination, Michael Uthe stated that he knew Jonathan, who was the victim's friend, and he also knew Casey Maxey, who was a family friend.

Penelope McDonald testified that she is the sexual assault nurse examiner coordinator at the Sexual Assault Crisis Center and that her organization works collaboratively with local law enforcement in Knoxville as part of a sexual assault response team. McDonald testified that she examined the victim in March of 2001 after Kathy Pappas, a police officer with the Knoxville Police Department, called to make the victim an appointment. McDonald stated that, after speaking with

Officer Pappas, she interviewed the victim and then conducted a forensic examination. McDonald testified that the victim told her that she "was spending the night with her cousin and had been [woken] up in the middle of the night, and her cousin's boyfriend had his hand in her pants and was fondling her." She also said that the victim complained of some discomfort in her private parts. McDonald explained that, because the victim stated that she had been digitally penetrated, McDonald did not collect any specimens from the victim's genital area. McDonald stated that she performed a pelvic exam of the victim and she found a small laceration of the labia minora and a bruise right next to that same laceration. McDonald testified that, when she performed this part of the examination, the victim complained that it was very painful. McDonald opined that the injuries were "acute" injuries, meaning that they were still in the early stages of healing and were not very old. McDonald explained that the injuries occurred within the previous 72 hours of the examination. She stated that the injuries were consistent with the penetration by a finger. On cross-examination, McDonald admitted that another instrument, other than a finger, could cause a similar bruise. McDonald also stated that the Defendant's fingernails had not been tested for DNA[1] evidence.

Kathy Pappas, an investigator with the Knoxville Police Department, testified that the victim and the victim's father came to the police department at 9:40 a.m. on March 12, 2001, to talk with an investigator, and she volunteered to meet with them. Officer Pappas testified that she took the victim to the Sexual Assault Crisis Center to be examined. The officer stated that, later that afternoon, she and another officer went to the Defendant's apartment to transport him to the police station for questioning. Officer Pappas stated that the Defendant waived his rights and that she then asked the Defendant about the events of the previous evening. The officer said that the Defendant told her that he picked up the victim from her home and brought her to his apartment, where she talked on the phone and watched some television until Medlin and Parton returned. Officer Pappas said that the Defendant told her that he had not been drinking and that Medlin was a "drug user and was in recovery and that he was just trying to keep her straight and keep her off drugs." The officer testified that the Defendant denied "everything and said that he did not have sex with [the victim]." On cross-examination, the officer stated that the Defendant told her that he went to sleep that night on the sofa in the living room and that the victim went to sleep on the floor. The officer testified that the Defendant said that, at some point, the victim wanted the sofa, so he switched places with her.

John Lawson, an officer with the Knoxville Police Department, testified that he was called to Medlin's apartment at approximately 6:00 a.m. on March 11, 2001. The officer testified that, when he arrived, the victim, her father and Medlin were waiting in the parking lot, and they all seemed "upset." Officer Lawson testified that he sent the victim to the police department and that Officer Pappas took over the case from there.

Stacy Parton testified that she had known the Defendant for one month prior to the incident because he was Medlin's boyfriend. Parton testified that, on Saturday March 10, 2001, she and Medlin went to Parton's cousin's wedding and that they came back to the apartment between 8:30 p.m. and 9:00 p.m. Parton stated that neither she nor Medlin consumed any alcohol at the wedding.

---

[1]Deoxyribonucleic acid.

She said that, after she and Medlin arrived at the apartment, they "sat around, . . . watched TV, . . . talked, and went to bed" between 11:00 p.m. and 12:00 a.m. Parton testified that she, Medlin and the Defendant went to bed in the bedroom and that the victim was in the living room on the couch. Parton testified that, after she went to sleep, the next thing that she remembered was the victim "beating on the door. She was crying and upset." Parton stated that, when she woke up, only Medlin was in the bedroom with her. She said that, after the victim came into the bedroom, the victim tried to tell them what had happened. Parton said that she told Medlin that they should be quiet and leave so that Parton and Medlin could calm the victim down and understand her better. Parton testified that the Defendant was in the living room when they were leaving. She stated that the Defendant asked her what was wrong with the victim, and she responded that she did not know.

Parton stated that, after they left Medlin's apartment, they went to the victim's parents' house. She said that, when they arrived at the victim's home, Medlin and the victim went into the house and talked to the victim's father. Parton explained that she and Medlin left in her car and that the victim and the victim's father left in his car, and they both drove back to Medlin's apartment and called the police.

The Defendant called the victim to testify and she stated that she remembered meeting Casey Maxey at McDonald's from time to time and that she would meet him at places with friends. The victim stated that she did not remember ever being at Medlin's apartment at the same time as Maxey, but she was not sure if that was correct. The victim admitted that she said at the preliminary hearing that her shorts were tight around the waist and tight around the legs, but denied that her statement was accurate, stating, "I don't wear tight clothes. They are uncomfortable for me." The victim stated that she had seen Maxey in the last five or six months, but that she no longer spoke with him because they no longer had anything to talk about.

Based upon the foregoing evidence, the jury convicted the Defendant of aggravated rape, and the trial court set a date for the sentencing hearing.

## B. Sentencing Hearing

On June 26, 2002, the trial court held a sentencing hearing, after which it sentenced the Defendant to life in prison without the possibility of parole. The Defendant was represented by new counsel at the sentencing hearing. At the conclusion of the sentencing hearing, the trial court found:

> [The Defendant] has been convicted in this case of aggravated rape by a jury of his peers . . . as a class-A felony. Section 40-35-120, with regard to repeat violent offenders provides that, "A repeat violent offender is a defendant who, under (a)(5) or (6) is convicted in this state after July 1, 1995, of any offense classified in subdivision (d)(1), as a violent offense, and has at least one prior conviction for an offense classified in (d)(1) or (d)(2) as a violent offense, with the exception of robbery by the use of a deadly weapon." . . . (d)(1) includes the convictions of rape. It appears, and I find from the record in this cause[,] that [the Defendant] was

previously convicted of two counts of rape in the Knox County Criminal Court in 1987 with the judgment of the Court, being entered on January 20th, 1987, in Division II of Criminal Court of Knox County.

I further find, based on the record in this cause, that [the Defendant] served a period of incarceration resulting from that conviction and was released in 2000–I don't remember the exact date–in 2000, that he was released from the Tennessee Department of Corrections, his sentence having expired at that time. . . . Under this statute, that separate period of incarceration referred to in (e)(2), includes in my judgment, a period of incarceration in the Tennessee Department of Corrections. So I find beyond a reasonable doubt in this case that [the Defendant] has suffered two prior convictions for rape in 1987 in Division II, Criminal Court, that he served a period of incarceration in the Tennessee Department of Corrections and was released i[n] 2000; that he was charged with the aggravated rape of the victim in this matter and convicted of that offense in this Court on . . . March 12th of 2002. Therefore, under the statute, as it exists today, I find that he is a repeat violent offender and per the instructions–the mandatory instructions of that statue–having made that finding, the Court is required to sentence you to life imprisonment without the possibility of parole. That will be the judgment of the Court. That does not preclude your opportunity to raise any of these other issues, including attacking this statute at future hearings. . . .

### B. Evidence Presented at Motion for New Trial

On December 12, 2002, and March 10, 2003, the trial court held hearings on the Defendant's motion for new trial at which the Defendant was represented by new counsel. In his motion for new trial, the Defendant claimed, inter alia, that he received ineffective assistance of counsel, and at the hearing on the motion he called his trial counsel, Russ Greene ("Counsel"), to testify. Counsel testified that he has been a licensed attorney for five and a half years and that he primarily practices criminal defense law. Counsel stated that the first time that he met the Defendant was in jail after one of Counsel's clients referred the Defendant to him. Counsel testified that, at that first meeting, he and the Defendant discussed the Defendant's case, that the Defendant was charged with aggravated rape and that, if convicted, he would probably be sentenced under the "habitual offenders act." Counsel stated that he charged the Defendant $3,000 to represent him. Counsel testified that the Defendant told him that he did not digitally penetrate the victim, but that he "rubbed outside her pants in the vagina area." Counsel stated that the Defendant wrote him letters claiming that the victim had two boyfriends, one named Casey Maxey and one named Jonathan. He testified that, according to the Defendant, Medlin said that the victim's father had molested the victim. Counsel also testified that the Defendant told him that the victim had complained of rape prior to this incident, but that the victim's father did not believe her. Counsel admitted that he did not "follow up" on any of this information.

Counsel testified that the Defendant told him that the victim "acted sexy with him" and had

danced for him, asking him, "Have I shown you my underwear lately?" Counsel also stated that the Defendant told him that the victim had just broken up with one of her boyfriends and that, on the night of the rape, she was on the phone with one of these boyfriends crying. Counsel testified that he tried to find Jonathan and Casey, but he was unable to locate them. Counsel testified that he did not interview the victim, the victim's stepmother, Medlin, Parton, Officer Lawson or Nurse McDonald before trial. Counsel stated that Officer Lawson's notes from the victim's initial statement indicated that the victim said that the Defendant "felt her up" in quotes, but did not indicate that the Defendant penetrated her.

Counsel testified that he had his sister, a nurse practitioner, review McDonald's qualifications, but that he did not pay her for this service. Counsel stated that, in hindsight, he should have asked McDonald about why she did not photograph the injury and should have hired an expert to criticize McDonald's investigation. The Defendant offered affidavit testimony of Edward L. Cornett, an Emergency Department Physician, in which Dr. Cornett stated that he reviewed the Rape Crisis Center records and that it appeared that the State offered no forensic evidence to establish the etiology of the victim's physical injuries. The doctor stated that, based upon this, if he were called to have testified he would have testified that "within a reasonable degree of medical certainty . . . no forensic evidence was collected or presented to establish a connection physically between the individuals in this matter."

Counsel stated that, even though the victim woke up in the middle of the night with a "fresh complaint" of rape, his theory of the case was that she was lying and that she was not asleep that night. Counsel explained that his theory was that the victim planned this charade because one of her boyfriends actually created the injury, and she did not want her parents to know. Counsel testified that the victim's testimony was "unbelievable" because her shorts were tight on her and she would have been awakened had the Defendant put his hands up her shorts. Counsel admitted that, before the trial, he never saw the shorts that the victim was wearing on the night of the incident.

Counsel stated that he did not remember the Defendant telling him that the shorts presented at trial were not the shorts that the victim was wearing on the night of the rape. Counsel admitted that, in his opening statement, he said, "You are going to hear about discrepancies" and "you're going to hear about boyfriends," but that he presented no proof of any boyfriend or discrepancy during the trial. Counsel testified that the Defendant did not take the stand because he would have had to admit that he touched the victim on the outside of her clothes, because his two prior rape convictions would come in and because he was being investigated for "looking into women's windows."

Counsel testified that he never attempted to challenge the constitutionality of the repeat violent offenders statute. Counsel also admitted that he never investigated to see if the two guilty pleas, previously given by the Defendant for two rapes, were properly entered.

On cross-examination, Counsel testified that, in the Defendant's statement to police, he stated that he was sleeping on the floor in the living room on the night in question and that the victim got

up and started yelling for no apparent reason. He also admitted that Officer Lawson never testified that the victim stated that the Defendant "felt her up" and that such testimony would not have been advantageous to the Defendant. Counsel testified that his trial tactic was to impeach the victim's credibility not to assert that the Defendant was guilty of sexual battery rather than rape. Counsel testified that he cross-examined the victim regarding the shorts that she was wearing that evening and that he tried to have her try them on to show how tight they were, but the victim testified that she had gained weight since the incident and the court sustained the State's objection. Counsel testified that the trial court ruled that, had the Defendant testified, the State could not impeach him with his prior rape convictions, but could impeach him with his prior burglary conviction. Counsel stated that he would have cross-examined the victim regarding her alleged claim that her father had raped her and that another man had raped her, but that the trial court limited his questioning of her sexual history to the previous 72-hour period.

On March 10, 2003, the trial court conducted another hearing to hear arguments and testimony regarding whether there was a timely recusal by the District Attorney's Office. General Nichols, the District Attorney General for Knox County, testified that in May of 2001 he had thirty-one assistant district attorneys general. General Nichols said that, before he became the District Attorney, he was a criminal court judge in Knox County from June of 1988 until August of 1992, and that, before 1988, he was in private practice for about ten years. The general testified that he remembered very well his representation of the Defendant and that, during the course of this representation, he got to know the Defendant's father well. General Nichols testified that, after the Defendant was released from prison on the convictions for which the general represented him, the Defendant's father called the general and told him that the Defendant was having trouble finding work. The general stated that he suggested to the Defendant's father a couple of people that he knew would hire people released from prison, and he gave the Defendant's father their names and numbers. General Nichols stated that, at the time that he had this conversation with the Defendant's father, General Nichols was the District Attorney General for Knox County.

The general testified that, sometime around the Defendant's arrest, he learned of the charges against the Defendant from the newspaper. The general testified that William H. Crabtree had signed the general's name to the Defendant's indictment. He said that Crabtree and John Gill, both of whom work in the general's office, had the authority to sign indictments in the general's absence. General Nichols testified that, when the indictment was signed, he was absent from work regularly because he was campaigning for governor. The general testified that he had no recollection of the indictment or of the preliminary hearing.

General Nichols testified that, normally, if there is a conflict or a potential conflict with his office, someone in his office sends a form to the Attorney General's Conference and that, then, Wally Kirby, the Executive Director of the Attorney Generals, finds somebody to take the case. The general said that the form was apparently sent in this case, and General Ramsy's office was chosen to represent the State pro tem. He explained that he had no "specific recollection" about the recusal process in this case.

On cross-examination, the general testified that he was practicing with Ralph Harwell at the time that he represented the Defendant in 1987. General Nichols testified that, when he represented the Defendant, the Defendant pled guilty to two different rapes. He said that he believed that he talked extensively with the Defendant during his representation of him and that he got to know the Defendant's father, with whom he remains friends. General Nichols testified that the evidence in the cases for which he represented the Defendant was "very powerful," and there were significant psychological injuries to one of the victims, so he encouraged the Defendant to plead guilty. He said that the Defendant also had a significant substance abuse problem involving cocaine.

General Nichols testified that there was no formal system in place for his assistants to know whether he had previously represented a person who was going to be indicted by the State. The general stated that Kathy Sellars, who is a secretary for the violent crimes unit in his office, requested the Defendant's old archived files from 1987, and those files were delivered before the preliminary hearing. He said that, on one of the faxes requesting this information, there was a yellow sticky note that said, "Told Kathy to rest unless pro tem appointed notified by Alice." General Nichols testified that "Alice" was Alice Ann Ferguson, who was Wally Kirby's secretary. He said that Ferguson is the one to whom pro tem requests go initially. The general stated that the note appeared to be written by Ashley Julian, his secretary, and that it appeared that "somebody [in my office] had . . . found out that I had represented [the Defendant] and considered it to be a potential conflict of interest, and the ball had gotten [rolling] on having a pro tem appointed sometime between his arrest and this date," which was prior to the preliminary hearing. The general stated that he did not think that his representation of the Defendant in 1987 presented a conflict with the prosecution of this case because "there's nothing that I know that added to the prosecution of this case or detracted from it," but the general admitted that it could have the appearance of impropriety.

Robert E. Jolley testified that he is presently in private practice, but, at the time of the Defendant's indictment, he was an assistant district attorney with General Nichols' office. Jolley testified that he represented the State at the preliminary hearing in the Defendant's case. He said that he was aware that, prior to the current rape indictment and subsequent to the Defendant's two previous rape convictions, there were warrants for the Defendant that involved a violation of probation and some misdemeanors. Jolley said that he did not participate in these cases because he was responsible primarily for homicide and violent offenses. He said that, while he does not specifically remember preparing for the Defendant's preliminary hearing, he would have looked at the Defendant's prior record, talked to the witnesses before presenting them and talked to other attorneys in the office regarding the case. Jolley testified that, at the time of the preliminary hearing, he was unaware that General Nichols had previously represented the Defendant. Jolley testified, "It was not the procedure in the office that General Nichols would be contacted about any of these cases, unless his name had come up." Further, he said that his handwriting is on the original indictment showing the grand jury number on the indictment, and it was the practice of the office to write that number on the indictment before it went into the grand jury room and before the presentation of the witnesses to the grand jury. Jolley stated that he had no personal recollection of speaking with the general about this case prior to the indictment or after the indictment. On cross-examination, Jolley testified that he requested that the Defendant's bond be raised after the preliminary hearing.

William H. Crabtree testified that he is an assistant district attorney in General Nichols' office, and has been an ADA since 1976. Crabtree testified that he signed General Nichols' name to the Defendant's indictment and that he was authorized to do so when General Nichols was unavailable. He said that this information is his only recollection of the Defendant's case. On cross-examination, Crabtree testified that he did not know how the District Attorney General Pro Tem came to be appointed in this case.

James N. Ramsey, the District Attorney General in the Seventh Judicial District, Anderson County, testified that he first got notice of the request for his appointment as an attorney pro tem shortly before June 21, 2001. He testified that, while he did not specifically recall, he thought that he got a call or a fax from Alice Ferguson requesting that he take "a pro tem status with regard to Randy Nichols." General Ramsey stated that there was a faxed document dated June 21, 2001, at 9:47 a.m. that indicates that he had already been contacted and accepted the pro tem assignment. The general testified that his first and only personal appearance in this case was on August 9, 2001, and that, thereafter, he assigned the case to Jan Hicks, who is the chief deputy district attorney in his office. General Ramsey stated that he never had any conversations with General Nichols about this case before the trial.

Ashley Julian testified that she is General Nichols' secretary and that she recognized her handwriting on the Post-It note on the fax that told Kathy Sellars to have the Defendant's case reset unless a pro tem was appointed. Julian stated that the Post-It note could have been in response to the fax or that it could have been placed on the fax months after the fax was received. Julian testified that she had no recollection of this case, but that, "Typically what I do is I type up a request, and then I send a fax, and I may follow up with a telephone call saying that I have sent them a fax requesting a pro tem . . . ." Julian testified that the date on the fax was May 9, 2001, and that she sent a letter requesting a pro tem be appointed on June 21, 2001. Julian testified that she did not remember who directed her to request a pro tem.

In a written order, the trial court denied the Defendant's motion for new trial, and the Defendant now appeals.

## II. Analysis

The Defendant now appeals, contending that: (1) the evidence is insufficient to support his conviction for aggravated rape; (2) the trial court erred when it failed to dismiss the indictment; (3) the trial court erred when it charged the jury on the elements of aggravated rape and aggravated sexual battery and on the culpable mental state; (4) he was denied effective assistance of counsel; (5) Tennessee Code Annotated section 40-35-120, under which the Defendant was sentenced as a violent offender, is unconstitutional; and (6) the trial court erred when it found that the Defendant qualified as a violent offender pursuant to Tennessee Code Annotated section 40-35-120.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence presented at his trial is insufficient to support his conviction for aggravated rape. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Buggs, 995 S.W.2d at 105; Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of aggravated rape. Aggravated rape is "unlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances: . . . [t]he defendant causes bodily injury to the victim . . . ." Tenn. Code Ann. § 39-13-502 (1997). "Bodily injury includes a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (1997). Sexual Penetration means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (1997).

The victim testified that, when she woke up during the night of the rape, the Defendant had his hands inside her shorts and his fingers inside her and that she felt a "pinch" or "scrape" approximately one inch inside her vagina. She testified that the feeling was painful. The victim also testified that she had not had sexual contact during the three days prior to the rape. Nurse Penny McDonald, who examined the victim subsequent to the rape, testified that her examination revealed a laceration on the victim's labia minora that was two centimeters by two millimeters and a bruise next to the laceration, both of which were in the early stages of healing, meaning that they were suffered within the last 72 hours. The nurse also testified that the victim complained of some discomfort in her private parts and, when the nurse performed the examination, "[I]t was very painful

for the victim." Nurse McDonald testified that the victim's injuries were consistent with the penetration of the victim's vagina by a finger. We conclude that the evidence was sufficient to support the Defendant's conviction for aggravated rape.

## B. Indictment

The Defendant contends that the indictment in his case should have been dismissed because General Nichols had a conflict of interest due to his previous representation of the Defendant in two rape convictions in 1987. The Defendant asserts that the Assistant District Attorney, employed by General Nichols, had broad discretion in charging the Defendant and, in fact, originally charged the Defendant with rape and then indicted the Defendant for aggravated rape. This broad discretion, the Defendant contends, combined with General Nichols' previous representation of the Defendant, created an actual conflict and, therefore, the indictment should be dismissed. The State contends that there was no conflict because General Nichols did not knowingly represent the State against the Defendant and because, at the time of the Defendant's indictment, General Nichols had "effectively turned over [the] day-to-day operation of the office to his subordinates while . . . running for governor." Further, the State contends that the general's representation of the Defendant in 1987 had nothing to do with the victim or circumstances of the instant case and, therefore, the general did not divulge any privileged information. When the trial court overruled this issue in its order on the Defendant's motion for new trial, it stated:

> There is no question that it would not have been appropriate for General Nichols to actively participate in the prosecution of [the Defendant], having personally represented [the Defendant] in the 1980s. Further, even if General Nichols had not personally participated in the prosecution of [the] [D]efendant, the appearance created by allowing members of his staff to prosecute the case once a conflict had been identified, would, in this court's opinion, be inappropriate.
>
> The facts as established in this case, however, establish that all actions taken by the District Attorney's Office in Knox County in handling the preliminary hearing and grand jury proceedings were done at a time when General Nichols was unaware that [the Defendant] had been charged with anything. Both Bob Jolley and Bill Crabtree testified that they had no conversation or input from General Nichols regarding the case. Once General Nichols realized that the case existed, appropriate steps were taken to remove his office from further involvement and [to] transfer the case to General Ramsey's Office. [I] believe, under the facts of this case, that General Nichols and his staff acted properly. Once they realized a potential conflict existed, the case was transferred from their office for prosecution by others. [The] Defendant was not prejudiced in anyway by the limited involvement of the Knox County District Attorney General's Office, and the court therefore concludes that this issue is without merit.

This case apparently presents one of first impression: A district attorney absent from his

office due to responsibilities of a gubernatorial campaign allows his assistant district attorney to sign indictments on his behalf. The assistant district attorney signs one such indictment for a defendant whom the district attorney previously represented fourteen years before the indicted offense. The district attorney is then recused and a pro tem district attorney general is appointed. We now determine if the district attorney's signature, signed by his assistant, invalidates the indictment, requiring that it be dismissed.

Because there is evidence that the Defendant did not raise the alleged defect in the indictment prior to trial through a motion to dismiss the indictment, we could conclude that the Defendant waived his right to complain about the defect. See Tenn. R. Crim. P. 12(b)(1) & (f) (stating that defenses and objections based on defects in the indictment must be raised prior to trial or they are considered waived); see also Pope v. State, 285 S.W. 775, 776 (Tenn 1924) (maintaining that a defect in an indictment can be cured by the jury's verdict after the defendant pleads to the indictment and goes to trial); Jackson v. State, 475 S.W.2d 563, 565 (Tenn. Crim. App. 1971) (finding that objections to the form of the indictment are generally waived by the defendant going to trial without calling the defect to the trial court's attention); but see McLean v. State, 527 S.W.2d 76, 82 (Tenn. 1975) (finding that a material variance in the indictment, between the offense charged and the evidence offered, is not normally waived). However, because the Defendant seemingly attacks the substance of the indictment, by alleging that he was denied a fair trial and due process of law, and not its form, we will address this issue on its merits.

The question of the validity of an indictment is one of law and, as such, our review is de novo. State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Under both the United States and the Tennessee Constitutions, a charging instrument, such as an indictment, must inform the accused of "the nature and cause of the accusation." See U.S. Const. amend. VI; Tenn. Const. art. I, § 9; State v. Hammonds, 30 S.W.3d 294, 297 (Tenn. 2000). In addition, Tennessee Code Annotated section 40-13-103 requires, "No district attorney general shall prefer a bill of indictment to the grand jury without a prosecutor marked thereon, unless otherwise expressly provided by law." Further, the indictment must contain the signature of the district attorney general. See David Louis Raybin, *Tennessee Practice Criminal Practice and Procedure* § 16.14 (1984). The Tennessee Supreme Court has stated:

> [A]n indictment is sufficient to satisfy the constitutional guarantees of notice to the accused if the indictment contains allegations that: (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense.

Hammonds, 30 S.W.3d at 299 (citing Hill, 954 S.W.2d at 727). In Hammonds, the Court announced its "relaxation of common law pleading requirements and . . . reluctance to elevate form over substance when evaluating the sufficiency of indictments" and stated, "[I]ndictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." Id.

The Defendant in this case asserts that the indictment against him should be dismissed based upon prosecutorial misconduct. The Tennessee Supreme Court has stated:

> [D]ismissal of an otherwise valid indictment returned by a grand jury is a little-used remedy for prosecutorial misconduct. United States v. Williams, 504 U.S. 36, 54, 112 S. Ct. 1735, 1746, 118 L. Ed. 2d 352 (1992). It may be appropriate, however, where prosecutorial misconduct denies a defendant the constitutional right to due process. See United States v. Carrasco, 786 F.2d 1462, 1455 (9th Cir. 1986); People v. Torres, 245 Ill. App. 3d 297, 184 Ill. Dec. 311, 613 N.E.2d 338, 340 (1993). Moreover, dismissal of an indictment may be appropriate under a court's general supervisory authority where prosecutorial misconduct, while short of constitutional error, has prejudiced a defendant or affected the charging decision by the grand jury. Bank of Nova Scotia v. United States, 480 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988).

State v. Culbreath, 30 S.W.3d 309, 317 (Tenn. 2000). To be entitled to the relief that the Defendant seeks, he first must prove that the prosecution engaged in misconduct, and, second, he must show that such conduct infringed upon his constitutional due process rights, prejudiced him or affected the charging decision by the grand jury. Id. Even assuming, arguendo, that the Defendant established that the prosecution committed misconduct, he has failed to establish that such alleged misconduct infringed upon his constitutional rights, prejudiced him or affected the charging decision. Therefore, he cannot be successful on the appeal of this issue.

After reviewing the record, we hold that the Defendant has not shown that any conduct, or alleged misconduct, by the prosecution infringed upon his constitutional due process rights. A citizen has the right to due process of law under the Fourteenth Amendment to the United States Constitution and under the "law of the land" provision of article I, section 8 of the Tennessee Constitution. The Tennessee Supreme Court has recognized that "'due process . . . calls for such protections as the particular situation demands.'" Id. at 317 (quoting Wilson v. Wilson, 984 S.W.2d 898, 902 (Tenn. 1998); Phillips v. State Bd. of Regents, 863 S.W.2d 45, 50 (Tenn. 1993)). This Court should consider three factors when deciding whether there has been a due process violation:

> (1) the private interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Wilson, 984 S.W.2d at 902. After considering these factors, we conclude that the Defendant's due process rights were not violated. The liberty interest at stake is obviously significant as the Defendant was indicted for a felony offense; however, the risk of erroneous deprivation of this interest (the prejudice to the Defendant) is minimal because General Nichols, who the Defendant alleges committed misconduct, was replaced by a District Attorney General Pro Tem prior to the

Defendant's trial. The participation of General Nichols in the pre-trial process was extremely limited and did not render the proceedings fundamentally unfair. As to the third consideration, we note that the Defendant argues that there should be a formal conflict system in place in General Nichols' office so that any defendant whom the general previously represented would not be subsequently indicted by the general's office. While such a system might be advantageous for the district attorney's office to avoid potential conflicts, it is not a necessity. Accordingly, we conclude that the Defendant has not met his burden of showing that the alleged misconduct by the prosecution infringed upon his constitutional rights.

Further, the Defendant did not show how he was prejudiced by the actions of the prosecution. Upon learning that his office was prosecuting the Defendant, a district attorney <u>pro</u> <u>tem</u> was appointed, and no one in General Nichols' office was further involved in the Defendant's case. The Defendant received a fair trial by an impartial jury. Prosecuting the Defendant was an assistant district attorney who had no knowledge gained by General Nichols' previous representation of the Defendant. Therefore, we conclude that the Defendant has not shown prejudice.

Finally, the Defendant did not prove that any alleged misconduct by the prosecution affected the charging decision against him. Included in Counsel's trial file was an Investigative Action Report by Officer Pappas that stated:

> This investigator contacted ADA Marsha Mitchell. She was advised by investigator about the case, the evidence, the suspect's criminal history, and the allegations that the suspect has been looking into female's windows. She was advised that the suspect could be a flight risk. She advised to go ahead and pick the suspect and charge him with rape.

Later, presumably after learning all of the facts of the case, including that the victim was injured during the rape, the district attorney's office decided to indict the Defendant for aggravated rape. The general testified that, at the time of the Defendant's indictment, he was unaware that his office was prosecuting the Defendant. Therefore, we hold that the fact that the Defendant was ultimately indicted for aggravated rape, after being charged with rape, does not prove that the general's prior representation of the Defendant in any way affected the charging decision by the grand jury. As further support for this holding, we note that the jury found the Defendant guilty of all of the elements of aggravated rape beyond a reasonable doubt. Such finding by the jury negates any argument by the Defendant that he was improperly charged with the crime for which he was convicted. Accordingly, we conclude that this issue is without merit.

### C. Jury Charge

The Defendant next contends that, when the trial court instructed the jury, it "added additional elements to the offenses of Aggravated Rape and Aggravated Sexual Battery." He says that, to the charge of aggravated rape, the trial court added the element of "knowledge of the Defendant that the victim was mentally defective, mentally incapacitated or physically helpless when

that element is only relevant if the Defendant was aided and abetted by others." Further, the Defendant contends that the court made the same error when charging the jury on aggravated sexual battery. Therefore, the Defendant contends, he was convicted of a crime that he was not charged with. The Defendant also contends that the trial court erred because the State charged that the Defendant acted "recklessly" when committing this crime and the trial court charged that the Defendant must have acted either intentionally, knowingly or recklessly. Finally, the Defendant asserts that the trial court erred when it did not instruct the jury on voluntary intoxication.

The State concedes that the trial court improperly instructed the jury, but states that any error is harmless. The state asserts that, to find the Defendant guilty of aggravated rape, the jury must find two elements beyond a reasonable doubt: (1) that the Defendant penetrated the victim; and (2) that the Defendant caused bodily injury to the victim. The trial court's charge to the jury required that it find an additional element beyond a reasonable doubt in order to find the Defendant guilty of aggravated rape and, therefore, was harmless error. As to the mens rea instruction, the State notes that both an intentional or knowing mens rea include a reckless mental state and, accordingly, asserts that this instructional error is also harmless. We agree with the State on both accounts.

### 1. Aggravated Rape and Aggravated Sexual Battery Instruction

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. See State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999); State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). In other words, the court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. Elder, 982 S.W.2d at 876. Even if a trial court errs when instructing the jury, such instructional error may be found harmless. State v. Williams, 977 S.W.2d 101, 104 (Tenn. 1998). A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997); see also State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997).

With regard to aggravated rape, the trial court charged the jury as follows:

> For you to find the defendant guilty of this offense as charged in the first count, the State must have proven beyond a reasonable doubt the existence of the following essential elements;
> (1) that the defendant had unlawful sexual penetration of [the victim]; and (2) that the defendant caused bodily injury to [the victim]; and (3)(a) that the defendant knew or had reason to know that the alleged victim was physically helpless; or (3)(b) that force or coercion was used to accomplish the act; and (4) that the defendant acted either intentionally, knowingly, or recklessly.

On aggravated sexual battery, the trial court instructed the jury:

For you to find the defendant guilty of [aggravated sexual battery], the State must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant had unlawful sexual contact with [the victim], in which the defendant intentionally touched the alleged victim's intimate parts or the clothing covering the immediate area of the alleged victim's intimate parts; and (2) that the defendant caused bodily injury to the alleged victim; and (3)(a) that the defendant knew or had reason to know that [the victim] was physically helpless; or (3)(b) that force or coercion was used to accomplish the act; and (4) that the defendant acted either intentionally, knowingly or recklessly.

Aggravated rape is defined by Tennessee Code Annotated section 39-13-502 as:

[U]nlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon . . . ; (2) The defendant causes bodily injury; (3) The defendant is aided and abetted by one (1) or more other persons; and (A) Force or coercion is used to accomplish the act; or (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless.

Aggravated sexual battery is defined as:

[U]nlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon . . . ; (2) The defendant causes bodily injury to the victim; (3) The defendant is aided or abetted by one (1) or more other persons; and (A) Force or coercion is used to accomplish the act; or (B) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or (4) The victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-504 (1997). After reviewing the instructions given to the jury by the judge in this case, we note that the trial court improperly instructed the jury that it must find the additional element "that the defendant knew or had reason to know that the alleged victim was physically helpless; or that force or coercion was used to accomplish the act" in order to find the Defendant guilty of aggravated rape or aggravated sexual battery. Accordingly, we agree with the parties that the trial court erred when it instructed the jury. However, we find that this error was harmless. The trial court fully instructed the jury on the offenses of aggravated rape and aggravated sexual battery, but added an element that was unnecessary for conviction based upon the indictment in this case. The jury was informed of the law and the definitions pertinent to the Defendant's case, and the jury charge in fact favored the Defendant by requiring the State to prove an additional element that was unnecessary. We fail to see how the verdict would have been any different had the trial court

omitted the additional requirement. See State v. Jones, 889 S.W.2d 225, 229 (Tenn. Crim. App. 1994) (holding that, when a trial court made an omission in a jury instruction, "[t]he instruction given by the trial court favored the defense. . . . Thus, the omission did not affect the results of the trial."). Therefore, we conclude that the jury charge on the additional element was harmless beyond a reasonable doubt.

## 2. Mens Rea Instruction

The Defendant contends that the trial court erred because the State indicted the Defendant for acting "recklessly" when committing this aggravated rape, and the trial court instructed the jury that it could find the Defendant guilty of aggravated rape if it found that the Defendant acted either intentionally, knowingly or recklessly. Tennessee Code Annotated section 39-11-301(2) (1997), states, "When recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly." Accordingly, it matters not whether the jury found the Defendant guilty beyond a reasonable doubt of acting with an intentional, knowing or reckless mens rea because all suffice to establish the reckless mens rea for which the Defendant was indicted. Therefore, we conclude that this issue is without merit.

## 3. Voluntary Intoxication Instruction

The Defendant next contends that the trial court erred when it failed to instruct the jury on voluntary intoxication. The Defendant argues that there was sufficient evidence of his intoxication so as to warrant an instruction. Voluntary intoxication is a defense to a criminal offense only if the intoxication negates the specific intent required by the crime. State v. Burkley, 804 S.W.2d 458, 461 (Tenn. Crim. App. 1990). "The two prerequisites for a voluntary intoxication defense are (1) the criminal offense (or a lesser included offense) for which the defendant is charged requires proof of a specific intent; and (2) the evidence of the defendant's intoxication warrants a jury instruction." Id. Proof of specific intent is not required to establish the offense of aggravated rape. State v. Lineberry, No. 01C01-9412CC-00439, 1995 WL 441608, at *4 (Tenn. Crim. App., at Nashville, July 26, 1995), *no perm. app. filed* (citing Harrell v. State, 593 S.W.2d 664, 670-71 (Tenn. Crim. App. 1979); Tenn. Code Ann. § 39-13-502 (1991 & Supp. 1994)). Therefore, we find that this issue is without merit.

## D. Effective Assistance of Counsel

The Defendant next asserts that he was denied effective assistance of counsel prior to and during his trial. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, accordingly, our review of this issue is de novo. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a defendant in a state criminal prosecution the assistance of counsel. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003) (citing Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Northington, 667 S.W.2d 57, 60 (Tenn.1984)); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation

includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result, id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a defendant must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the defendant's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

The Defendant claims that Counsel was ineffective by: (1) presenting a deficient and unreasonable theory of defense; (2) not having the Defendant testify that he only touched the victim on the outside of her clothes and not under her clothes; (3) failing to investigate the case by not interviewing Jonathan or Casey prior to trial; (4) giving a short, inadequate, opening statement; (5) not interviewing the victim prior to trial or using the information given by the Defendant that the victim had previously reported a rape and her father did not believe her claim; (6) not cross-examining Medlin regarding her alleged activities as a prostitute and her cocaine use; (7) not obtaining and reviewing the Rape Crisis Center records; (8) failing to inquire about the victim's emotional history; and (9) Counsel's lack of preparation, lack of contact with the Defendant, failure to notice errors in the jury charge and failure to investigate the constitutionality of the Defendant's prior convictions.

As stated above, an inquiry into the effectiveness of counsel is a two-prong analysis. The first prong requires that a defendant prove that his trial counsel's representation fell below an objective standard of reasonableness, and the second prong requires that the defendant show a reasonable probability that, but for this deficient performance, the fact finder would have had reasonable doubt regarding the petitioner's guilt. We now address whether the Defendant proved that Counsel's representation fell below an objective standard of reasonableness for any of the

actions alleged by the Defendant.

The Defendant alleges that Counsel was ineffective by presenting a deficient and unreasonable theory of defense. Counsel testified that his theory of defense was to attack the victim's credibility by showing inconsistencies in her testimony and to suggest that one of her boyfriends inflicted her injuries. In reviewing Counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002) (citing Strickland, 466 U.S. at 689). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. Booker v. State, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004). Deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The Defendant contends that Counsel should have presented the theory of defense that he rubbed the victim on the outside of her clothes, but that he never touched her underneath her clothes. This would have required the Defendant to testify. Had Counsel called the Defendant to testify, the Defendant could have been impeached by his prior burglaries, his recent activities looking into the windows of multiple women and by his prior statement to police that he had not touched the victim at all on the night of the rape. Counsel determined that the impeachment of the Defendant would do more harm than the good that would be done by his testimony. In our view, this decision by Counsel does not fall below an objective standard of reasonableness. Further, we conclude that the evidence does not preponderate against the trial court's finding that Counsel was not ineffective in providing a theory of defense. Further, even if we determined that the evidence did so preponderate, we could not conclude that the Defendant proved that he was prejudiced by this strategy. "[I]t cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The Defendant also contends that Counsel was ineffective by failing to investigate the case by not interviewing Jonathan or Casey prior to trial. Counsel stated that the Defendant wrote him letters claiming that the victim had two boyfriends, one named Casey Maxey and one named Jonathan. Counsel admitted that he did not follow up on any of this information. Counsel also testified that he tried to find Jonathan and Casey, but that he was unable to locate them. The Defendant has provided no evidence which would establish that, if a more thorough investigation had been conducted, there is a reasonable probability "the result of the proceedings would have been different." He has not provided any additional information that could have been used to properly impeach the victim. The trial court held that Counsel adequately investigated the case. After review, we find nothing which would lead us to disturb the conclusions of the trial court that an appropriate investigation was conducted.

The Defendant asserts that Counsel was ineffective by giving a short, inadequate, opening statement. The Defendant asserts that Counsel promised the jury that it would hear about "boyfriends" referring to Jonathan and Casey and that such evidence was never presented to the jury.

Counsel testified that his strategy was to impeach the victim and call into question her credibility and to suggest that the victim's injury could have been caused by a boyfriend of the victim rather than the Defendant. There are two major cases in Tennessee dealing with the failure of counsel to fulfill the promises made to the jury during voir dire or opening statement. In State v. Zimmerman, 823 S.W.2d 220, 221 (Tenn. Crim. App.1991), the defendant was charged with second degree murder, and during his opening statement counsel stated, in accordance with trial strategy, that the defendant and a psychologist would testify regarding the defense of "battered wife syndrome." However, at the conclusion of the State's proof, counsel recommended to the defendant that she not testify and rested without presenting the testimony of an expert regarding battered wife syndrome or any additional proof. Id. This court concluded that counsel was ineffective, stating that "nothing changed during the course of the trial . . . . In other words, there appears to have been no basis for the sudden change in strategy." Id. at 226. In State v. King, 989 S.W.2d 319, 330 (Tenn. 1999), the defendant, who was convicted of felony murder, complained that his counsel "abandoned the defense theory of voluntary intoxication after having introduced it to the jury during the opening statement." During King's trial, his ex-girlfriend testified for the prosecution that King had attempted to kill her when he was sober and, while doing so, repeatedly asked her "how it felt to be dying, so that the next woman he killed he would know how she felt." Id. at 331. At the post-conviction hearing, defense counsel asserted that "he decided to abandon the use of voluntary intoxication to defend [the defendant's] actions after the [ex-girlfriend's] testimony . . . [because the] testimony was unexpected and devastating to the appellant's case." Id. Counsel asserted that "the theory of voluntary intoxication was rendered futile" so Counsel "revised the defense theory solely in response to the surprise testimony." Id. Our supreme court determined that counsel's change of strategy during trial did not constitute ineffective assistance. Id.

Unlike these two cases, in the case presently before us, Counsel did not change his strategy during the course of trial, rather he stuck to it by attacking the credibility of the victim and suggesting that she had other boyfriends. In his opening statement, Counsel stated that the jury would "hear about boyfriends," and he tried to illicit such testimony from the victim and from her family. His failure to illicit this testimony does not fall below the objective standard of reasonableness. The evidence does not preponderate against the trial court's finding that Counsel's performance at trial was not ineffective in this regard.

The Defendant also asserts that Counsel was ineffective because he did not interview the victim prior to trial and did not question her about whether she had previously reported a rape to her father and whether her father believed her claim. The Defendant contends that, were these allegations true, it would go to the victim's credibility. However, Counsel requested that the trial court allow him to delve into the victim's sexual history, and the trial court specifically ordered that, because the injury occurred within 72 hours of the victim being examined by Nurse McDonald, Counsel could only question the victim about sexual encounters within that time frame. Therefore, by order of the trial court, Counsel was unable to inquire about this allegation, and such action on Counsel's part was not ineffective. As to his failure to interview the victim, the Defendant has not proved how any further investigation would have benefitted him. Accordingly, we conclude that this issue is without merit.

The Defendant next contends that Counsel did not adequately cross-examine Medlin because he did not ask her about her alleged activities as a prostitute and her alleged cocaine use. At the motion for new trial, the Defendant did not question Counsel with regard to Counsel's decision not to cross-examine Medlin regarding these issues. Accordingly, we assume that this was a strategic decision on Counsel's part. As previously noted, this court will not "second guess" the tactical and strategic decisions of counsel. Cooper, 849 S.W.2d at 746. Accordingly, we conclude that the evidence does not preponderate against the trial court's finding that Counsel was not ineffective in this regard.

The Defendant next alleges that Counsel was ineffective by not obtaining and reviewing the Rape Crisis Center records. Counsel testified that he had his sister, who was a nurse practitioner, review the qualifications of the nurse at the Rape Crisis Center, and his sister reported that the nurse practitioner performing the victim's exam was adequately qualified. At the hearing on the motion for new trial, the Defendant called a representative of the rape crisis center as a witness who verified the qualifications of the nurse practitioner who performed the victim's exam. This witness also produced the victim's records from the rape crisis center, which have been reviewed in camera by the trial court and by this court. The trial court's, and our, review of those records establishes that there was no evidence contained therein that would have aided the Defendant at trial. Therefore, the Defendant has not proven that any alleged ineffective actions by Counsel in this regard prejudiced him in any way.

The Defendant also asserts that Counsel was ineffective for failing to inquire about the victim's emotional history. He, however, did not question Counsel about this issue and provides no evidence regarding the victim's emotional history or how that history would have been beneficial to his defense. In light of this bare allegation, we find that this issue is without merit.

Finally, the Defendant asserts that the cumulative effect of Counsel's lack of preparation, lack of contact with the Defendant, failure to notice errors in the jury charge and failure to investigate the constitutionality of the Defendant's prior convictions constituted ineffective assistance of counsel. The trial court found that the Defendant "offers no evidence to establish that any actions by trial counsel were deficient or prejudicial to him." We conclude that the evidence does not preponderate against this finding.

### E. Constitutionality of Tennessee Code Annotated section 40-35-120

The Defendant asserts that Tennessee Code Annotated section 40-35-120 is unconstitutional for the following reasons: (1) it violates equal protection laws because "the Legislature lacked a rational basis for extending jury determination of recidivism to some classes of defendants but not to others" and because "the Legislature lacked a rational basis to treat certain classifications of 'violent offenders' more favorably than others;" and (2) it deprives him of due process as noted by two United States Supreme Court cases that "prohibit sentencing . . . defendants on an enhanced basis as a result of prior convictions, without the jury making such determination."

## 1. Equal Protection

First, the Defendant contends that Tennessee Code Annotated section 40-35-120 is unconstitutional because it violates equal protection laws by extending jury determination to some defendants and not others and by treating certain classifications of violent offenders more favorably than others. With regard to his first assertion, the Defendant notes that the "repeat violent offenders" statute, also commonly referred to as the "three strikes" statute, states, in part, "The court shall sentence a defendant who has been convicted of any offense listed in subdivision (b)(1), (c)(1) or (d)(1) to imprisonment for life without the possibility of parole if the court finds beyond a reasonable doubt that the defendant is a repeat violent offender as defined in subsection (a)." Tenn. Code Ann. § 40-35-120(g). The Defendant then argues that this statute, which mandates that the trial court determine whether the defendant is a violent offender, constitutionally conflicts with Tennessee Code Annotated section 40-35-203(e) (1997),[2] which requires that a jury determine whether the defendant was previously convicted of an offense used to enhance punishment for a second or subsequent violation of the same offense, in violation of his equal protection rights. Next, the Defendant contends that the violent offenders statute specifically exempts the offense of "robbery by use of a deadly weapon" as a prior violent offense in determining whether a defendant is a repeat violent offender, thereby treating some violent offenders differently than others, in violation of equal protection laws.

Article XI, section 8 and Article I, section 8 of the Tennessee Constitution provide for the equal protection of law provisions. Article XI, section 8 of the Tennessee Constitution provides in pertinent part:

> **General laws only to be passed.--** The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie, or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

Article I, section 8 of the Tennessee Constitution provides as follows:

> **No man to be disturbed but by law.--** That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any

---

[2]That Code section states:

> If the criminal offense for which the defendant is charged carries an enhanced punishment for a second or subsequent violation of the same offense the indictment in a separate count shall specify and charge such fact. If the defendant is convicted of the offense, then the jury must find that beyond a reasonable doubt the defendant has been previously convicted the requisite number of times for the same offense. Upon such finding, the defendant shall be subject to the authorized terms of imprisonment for the felonies and misdemeanors as set forth in § 40-35-111.

manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers of the law of the land.

Our supreme court has noted that these two provisions of the Tennessee Constitution provide for the equal protection of laws. State v. Tester, 879 S.W.2d 823, 827 (Tenn. 1994). These provisions of the Tennessee Constitution provide the same protection as the equal protection clause in the United States Constitution. Id. Unless the legislative classification disadvantages a "suspect class" or interferes with the exercise of a "fundamental right," requiring strict scrutiny analysis, the challenged statute is examined under the "rational basis test." Id. at 828; State v. Price, 124 S.W.3d 135, 138 (Tenn. Crim. App. 2003). The statute involved in this appeal must be analyzed under the "rational basis test." State v. Wyrick, 62 S.W.3d 751, 792 (Tenn. Crim. App. 2001).

The Tennessee Supreme Court has stated:

Equal protection constitutional provisions guarantee that "'all persons similarly circumstanced shall be treated alike.'" Tennessee Small Sch. Sys. v. McWherter, 851 S.W.2d 139, 153 (Tenn. 1993) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S. Ct. 560, 562, 64 L. Ed. 989 (1920)). This court has said: The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States, and the legislatures are given considerable latitude in determining what groups are different and what groups are the same. . . . In most instances the judicial inquiry into the legislative choice is limited to whether the classifications have a reasonable relationship to a legitimate state interest.

State v. Robinson, 29 S.W.3d 476, 480 (Tenn. 2000). The determinative issue is whether the facts show some reasonable basis for the disparate state action. Harrison v. Schrader, 569 S.W.2d 822, 825-26 (Tenn. 1978). Under this standard, if some reasonable basis can be found for the classification, or if any state of facts may be reasonably be conceived to justify it, the classification will be upheld. Tennessee Small Sch. Sys, 851 S.W.2d at 153-54. The burden of showing that a classification is unreasonable and arbitrary is placed upon the individual challenging the statute, and "if any state of facts can reasonably be conceived to justify the classification or if the reasonableness of the class if fairly debatable, the statute must be upheld." Id.

The United States Supreme Court stated, "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." Baxstrom v. Herold, 383 U.S. 107, 133 (1966). Equal protection of the law requires that the state treat persons under like circumstances and conditions the same. Genesco, Inc. v. Woods, 578 S.W.2d 639, 641 (Tenn. 1979), *superseded on other grounds by* Combustion Eng'g, Inc. v. Jackson, 705 S.W.2d 655 (Tenn. 1986). For this reason, "'[r]ecidivist statutes do not violate either the equal protection or the due process provisions of the State and Federal Constitutions.'" Wyrick 62 S.W.3d at 791 (quoting State v. Yarbro, 681 S.W.2d 521, 525 (Tenn. Crim. App. 1981)). In Wyrick, this Court addressed whether the violent offender statute violates equal protection because it prevents the trial court from considering any mitigating factors

in setting the defendant's sentence, stating:

> [T]he repeat violent offender statute treats defendants who have committed either two or three of certain specified violent offenses alike in that it imposes a sentence of life without parole for all qualifying defendants. See Tenn. Code Ann. § 40-35-120(g). Repeat violent offenders are under different circumstances than defendants who have not committed at least two violent offenses. Therefore equal protection of the law does not require that these two categories of offenders be treated alike.

Id. at 792.

We find our holding in Wyrick instructive to this case and conclude that the violent offender statute does not violate the equal protection of laws afforded by our constitution. As we stated in Wyrick:

> The purpose of the sentencing statutes is to promote justice. Tenn. Code Ann. § 40-35-102. Among the sentencing principles designed to promote that purpose are the principles of preventing crime and promoting respect for the law by providing a deterrent to those likely to violate the law and incarcerating defendants who commit the most severe offenses. Tenn. Code Ann. § 40-35-102(3)(A), (5). Furthermore, the legislature has a legitimate interest in protecting citizens from crime as a part of the state's police power. Motlow v. State, 125 Tenn. 547, 566, 145 S.W. 177, 183 (1912). The legislature's decision to impose the very severe sentence of life imprisonment without the possibility of parole upon those criminals who repeatedly commit violent offenses is rationally related to its desire to protect the public and deter crime. See Taylor, 628 S.W.2d at 47; see also State v. Thompson, 36 S.W.3d 102, 116 (Tenn. Crim. App. 2000). Thus, the repeat violent offender statute does not violate the defendant's right to equal protection of the law.

Id. (parenthetical information omitted).

In the case under submission, the Defendant's first assertion is that the repeat violent offender statute violates his equal protection rights because other statutes require that a jury determine whether a previous offense was committed and the violent offender statute mandates that the trial court make this determination. As we stated in Wyrick, "[r]epeat violent offenders are under different circumstances than defendants who have not committed at least two violent offenses. Therefore, the equal protection of the law does not require that these two categories of offenders be treated alike." Id. Therefore, we conclude that this issue is without merit.

The Defendant's second assertion is that the repeat violent offender statute violates his equal protection rights because it treats some violent offenders differently than other violent offenders. The Defendant contends that the statute removes offenders who commit robbery with a deadly weapon and offenders who commit aggravated assault from the list of offenses that are used to

qualify a defendant as a repeat violent offender, thereby treating some violent offenders differently from others. The violent offender statute defines a "repeat violent offender" in six ways, one of which is a defendant who "[h]as at least one (1) prior conviction for an offense classified in subdivision (d)(1) or (d)(2) as a violent offense with the exception of the prior offense of robbery by use of a deadly weapon as listed in § 40-35-118." Tenn. Code Ann. § 40-35-120(a)(6). The offenses listed in (d)(1) of the statute are: first degree murder; second degree murder; especially aggravated kidnapping; especially aggravated robbery; aggravated rape; aggravated arson; aggravated kidnapping; rape; aggravated sexual battery; especially aggravated burglary; aggravated child abuse; aggravated sexual exploitation of a minor; or especially aggravated sexual exploitation of a minor. Tenn. Code Ann. § 40-35-120(d)(1). Section (d)(2) states that offenses "which were repealed on November 1, 1989, and are listed in § 40-35-118 as Class A or B felonies against a person, with the exception of the offense of robbery by use of a deadly weapon, are classified as violent offenses." Tenn. Code Ann. § 40-35-120(d)(2).

The offense of "robbery by use of a deadly weapon" as codified in the historical section of the Code 39-2-501 (1982 and Supp. 1988) is now codified in three separate Code provisions: Tennessee Code Annotated section 39-13-401, defining robbery as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear; section 39-13-402 defining aggravated robbery as "robbery . . . accomplished with a deadly weapon . . . ; or . . . where the victim suffers serious bodily injury;" and section 39-13-403 defining especially aggravated robbery as "robbery . . . accomplished with a deadly weapon; and where the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401(a), -402(a)(1)-(2), -403(a)(1)-(2). By listing especially aggravated robbery in (d)(1) and omitting robbery by use of a deadly weapon from the list in (d)(2), the legislature ensured that only offenders that commit robbery where the victim suffered serious bodily injury would be considered repeat violent offenders under the violent offender statute. Similarly, the legislature omitted the crime of aggravated assault from the list in (d)(1) and aggravated assault may be committed when an offender "uses or displays a deadly weapon" when committing assault, but does not commit bodily injury. Tenn. Code Ann. § 39-13-102 (1997). We conclude that the legislature has a rational basis for treating offenders who inflict seriously bodily injury upon a victim during the commission of a crime differently from those who commit that crime while brandishing a deadly weapon, but cause no physical injury to the victim. Further, we conclude that the legislature has a rational basis for treating rapists, who sexually penetrate statutorily defined areas of a victim different from felons whose crimes do not involve such a violation of the victim. Accordingly, the Defendant, whose previous crimes include rape, which requires penetrating the victim, was not denied the equal protection of law. We conclude that this issue is without merit.

## 2. Due Process and Prohibitions Against Enhanced Punishment

The Defendant contends that the violent offender statute violates his due process rights because it is vague and overbroad and is contrary to two supreme court cases that "prohibit sentencing . . . defendants on an enhanced basis as a result of prior convictions, without the jury making such determination." The Defendant contends that the language of the violent offender statute is "particularly confusing" and "[t]he statutory language and definitions failed to provide

adequate notice to persons of what conduct constitutes repeat violent offender status." The Defendant also contends that two United States Supreme Court cases, Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000), "prohibit sentencing defendants on an enhanced basis as a result of prior convictions without the jury making such determination."

### a. Due Process

The constitutions of the United States and the State of Tennessee guarantee defendants in all criminal cases due process of law and the right to a fair and impartial jury. State v. Carruthers, 35 S.W.3d 516, 559 (Tenn. 2000). When a defendant challenges the constitutionality of a statute, the general principles of statutory construction apply. Appellate courts are charged with upholding the constitutionality of statutes wherever possible. State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990). In other words, we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute when reviewing a statute for a possible constitutional infirmity. Id.; see also In re Burson, 909 S.W.2d 768, 775 (Tenn. 1995). Generally, the language of a penal statute must be clear and concise to give adequate warning so that individuals might avoid the prohibited conduct. See State v. Boyd, 925 S.W.2d 237, 242-43 (Tenn. Crim. App. 1995). A statute is void for vagueness if it is not "sufficiently precise to put an individual on notice of prohibited activities." State v. Thomas, 635 S.W.2d 114, 116 (Tenn. 1982); see also State v. Wilkins, 655 S.W.2d 914, 915 (Tenn. 1983), *superseded by statute as stated in* State v. Dominy, 6 S.W.3d 472 (Tenn. 1999).

A criminal statute "shall be construed according to the fair import of [its] terms" when determining if it is vague. Tenn. Code Ann. § 39-11-104. "Due process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have reasonably understood to be proscribed." State v. Burkhart, 58 S.W.3d 694, 697 (Tenn. 2001) (citing Grayned v. City of Rockford, 408 U.S. 104 (1972)). Nevertheless, the Tennessee Supreme Court has noted that "absolute precision in drafting prohibitory legislation is not required since prosecution could then easily be evaded by schemes and devices." Wilkins, 655 S.W.2d at 916; see also Burkhart, 58 S.W.3d at 697; State v. McDonald, 534 S.W.2d 650, 651 (Tenn. 1976). To determine whether a statute is unconstitutionally vague, a court should consider whether the statute's prohibitions are not clearly defined and are thus susceptible to different interpretations regarding that which the statute actually proscribes. State v. Whitehead, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000). Therefore, a statute is not unconstitutionally vague "'which by orderly processes of litigation can be rendered sufficiently definite and certain for purposes of judicial decision.'" Wilkins, 655 S.W.2d at 91 (quoting Donathan v. McMinn County, 187 Tenn. 220, 228, 213 S.W.2d 173, 176 (1948)).

The Defendant contends that the statute is vague because the defined term "separate period of incarceration," which is used to determine what "prior convictions" the offender has, is constitutionally vague because it is unclear whether a defendant must serve one period of incarceration for his prior convictions or two periods of incarceration. The Defendant asserts that he was twice convicted of rape, but was confined for one continuous term of incarceration. Therefore, it is unclear whether he served "separate periods of incarceration" as required by the

statute.

According to Tennessee Code Annotated section 40-35-120, there are three ways to qualify as a repeat violent offender. Pursuant to subdivisions (a)(5) and (a)(6) of the statute, an offender is a repeat violent offender if the offender is convicted of any offense listed in (d)(1) and has at least one prior conviction for any offense classified in (d)(1) or (d)(2), except robbery by use of a deadly weapon, which is listed in the now repealed statute, Tennessee Code Annotated section 40-35-118. Subdivision (d)(1) lists the applicable offenses as: first degree murder; second degree murder; especially aggravated kidnapping; especially aggravated robbery; aggravated rape; rape of a child; aggravated arson; aggravated kidnapping; rape; aggravated sexual battery; especially aggravated burglary; aggravated child abuse; aggravated sexual exploitation of a minor; or especially aggravated sexual exploitation of a minor. Tenn. Code Ann. § 40-35-120(d)(1). Subdivision (d)(2) states that "For purposes of subdivision (a)(6), the offenses which were repealed on November 1, 1989, and are listed in § 40-35-118 as Class A or B felonies against a person, with the exception of the offense of robbery by use of a deadly weapon, are classified as violent offenses." Tenn. Code Ann. § 40-35-120(d)(2).

In determining the number of prior convictions a defendant has received the trial court must determine the number convictions that qualify as "prior convictions" pursuant to statute. Tenn. Code Ann. § 40-35-120(e)(1)(C). The statute states:

> "Prior conviction" means a defendant serves and is released from a period of incarceration for the commission of an offense or offenses so that a defendant must: . . .[t]o qualify under subdivision (a)(5) and (a)(6), at least one (1) separate period of incarceration for the commission of a predicate offense designated in subdivision (d)(1) or (d)(2), with the exception of the prior offense of robbery by use of a deadly weapon as listed in § 40-35-118, before committing an offense designated in subdivision (d)(1).

Tenn. Code Ann. § 40-35-120(e)(1)(C). "'Separate period of incarceration' includes a sentence to a community correction program pursuant to chapter 36 of this title, a sentence to split confinement pursuant to § 40-35-306, or a sentence to a periodic confinement pursuant to § 40-35-307. . . ." Tenn. Code Ann. § 40-35-120(e)(2).

In the case under submission, the trial court found that the Defendant qualified as a repeat violent offender pursuant to subdivisions (a)(5) and (a)(6) of the statute because he was convicted of aggravated rape after July 1, 1995, which is a violent offense listed in (d)(1), and he has at least one prior conviction for an offense listed in (d)(1), that being rape. The trial court found "that [the Defendant] was previously convicted of two counts of rape in the Knox County Criminal Court in 1987 with the judgment of the Court, being entered on January 20th, 1987, in Division II of Criminal Court of Knox County" and that the Defendant "served a period of incarceration resulting from that conviction and was released in 2000."

The Defendant does not dispute that he was convicted of two previous rapes,[3] and he does not dispute that he was sentenced to a prison term for those convictions. The Defendant also does not contest that, in this case, the Defendant was convicted for aggravated rape. Rather, what the Defendant disputes is that the term "separate" is constitutionally vague. We conclude that this argument is without merit. The statute requires that the Defendant be convicted of any offense classified in subdivision (d)(1) as a violent offense after 1995. See Tenn. Code Ann. § 40-35-120 (a)(5), (6). Here, the Defendant was convicted of aggravated rape, which is an offense classified in subdivision (d)(1) as a violent offense. Next, the Defendant must have at least one prior conviction for an offense classified in subdivision (d)(1) as a violent offense. Here, the Defendant had two prior convictions for rape, which is an offense classified in (d)(1) as a violent offense. The Defendant served one term in prison for his two previous rape convictions. This, however, classifies as a "separate period of incarceration" because it is a period of incarceration "separate" from the period of incarceration for the current aggravated rape offense. Because sections (a)(5) and (a)(6) require only one prior offense, it is clear that when the Legislature used the term "separate period of incarceration," it meant a period of incarceration separate from the period of incarceration to which the repeat violent offender is being currently sentenced. We hold that this statute is not unconstitutionally vague, and, accordingly, we conclude that this issue is without merit.

### b.  Prohibitions Against Enhanced Punishment

The Defendant also contends that two United States Supreme Court cases, Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000), "prohibit sentencing defendants on an enhanced basis as a result of prior convictions without the jury making such determination." In Apprendi, the United States Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" must be determined by the jury. Apprendi, 530 U.S. at 490; Wyrick, 62 S.W.3d at 761. In Ring, the Court extended Apprendi by preventing legislatures from constructing statutes so that elements of the crime could serve as enhancers and then providing separate statutes that allowed the trial court to make factual findings for sentencing purposes. The repeat violent offender statute clearly prescribes the sentencing of defendants on an enhanced basis as a result of prior convictions. Therefore, the statute does not violate Apprendi or Ring. See Wyrick, 62 S.W.3d at 761 (holding that the repeat violent offenders statute does not violate the holding in Apprendi). Accordingly, we conclude that this issue is without merit.

### F. Violent Offender Status

The Defendant contends that he does not qualify as a repeat violent offender pursuant to the statute because the State did not present the signed judgment proving that the Defendant previously pled guilty twice to rape. The Defendant made this objection at the sentencing hearing, and the State

---

[3]We recognize that the Defendant later argues that the State did not prove that he was previously convicted of these rapes. That argument will be addressed later in this opinion.

asserted to the court that the signed minutes of the court were adequate proof of the convictions. The trial court took judicial notice of its own minutes and found that the minutes were adequate proof of the guilty plea convictions. We conclude that these minutes were adequate evidence upon which the trial court could find beyond a reasonable doubt that the Defendant had the requisite predicate convictions to be considered a repeat violent offender. See Tenn. Code Ann. § 40-35-120(g). The Defendant, therefore, qualifies as a repeat violent offender, and we conclude that this issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE